# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| vs. | )     Crim. No. 10-229 |
| | ) |
| **BRENT KEVIN HERCULES** | ) |
| **ANTOINE and JEAN a. SERAPHIN,** | ) |
| **a/k/a ALLEN DEBROSSE,** | ) |
| | ) |
| **Defendants.** | ) |

## OPINION AND ORDER

### I. Introduction.

On September 14, 2012, at the close of the Government's case during the trial of this matter, Defendant Brent Kevin Hercules Antoine ("Mr. Antoine") orally moved for a judgment of acquittal pursuant to Fed.R.Civ.P. 29. September 14, 2012 transcript, p. 116. Specifically, Mr. Antoine contended that the government had not presented sufficient evidence for the jury to find beyond a reasonable doubt that it was he (Defendant Brent Kevin Hercules Antoine) who committed any criminal acts on March 3. 2010. Id. at pp. 116-121. The Court deferred ruling on the motion. Id. at p. 127. After the jury found Antoine guilty as to all counts of the Superseding Indictment filed against him and his co-defendant Jean Seraphin ("Seraphin"), the Court inadvertently failed to rule on the motion.

### II. Evidence presented during the Government's Case-in-Chief.

Because Mr. Antoine did not dispute that the government presented sufficient evidence for the jury to find the existence of all of the elements of all of the crimes with which he was charged in the superseding indictment other than the identification issue, the Court will focus its

discussion and analysis of the evidence presented at the trial on the evidence relevant to the identification issue only.[1]

### A. Testimony of Scott Township police officer Sergeant Stephen Fury.

Scott Township police officer Sergeant Stephen Fury ("Sergeant Fury") testified at the trial to the following information. On March 3, 2010, he was called to the Carnegie/Heidelberg, Pennsylvania Walmart located in the Raceway Plaza as a result of a 911 call placed by Robert Dean, an asset protection employee at the Carnegie/Heidelberg Walmart, which was located in the Plaza, that individuals had been in the store purchasing gift cards with credit cards that were being rejected. September 11, 2012 transcript, pp. 21 and 58. Sergeant Fury also was told that these individuals were in a light-colored Dodge Caravan minivan with a Florida registration plate and that one of the males was a smaller, light skinned, black male wearing a plaid jacket. Id. at p. 21.

When Sergeant Fury arrived at the Plaza, he saw a white Dodge Caravan minivan about to leave the Plaza parking lot. Id. at p. 26. He initiated a traffic stop and approached the white minivan. Id. In the minivan, Sergeant Fury observed four (4) black males. Id. at pp. 27, 31, and 32. One of the males, later identified as Richard Foster, was seated in the front passenger seat; he matched Robert Dean's description. Id. at p. 31. The prosecutor showed Sergeant Fury a photograph of a black male, whom Sergeant Fury identified as being the male who later was identified to be Mr. Foster; the photograph was admitted into evidence. Id. at p. 23. Sergeant Fury observed Defendants Antoine and Seraphin, who were seated in captain chair-style seats

---

[1] It is for this reason that the Court has not included in this Opinion a summary of the trial testimony of Scott Township Police Sergeant Alan Ballo, Craig Peterson, Lawrence Hayes, and Special Agent Jon Ferris; none of these witnesses provided any testimony that is relevant to the identification issue. For the same reason, the Court also has not included in its Opinion a listing of those facts stipulated to by the parties.

behind the driver and front passenger. Id. at p. 32. Antoine was seated behind the driver and Seraphin was seated behind the front passenger. Id. at p. 32-33.

Ramar Gardiner ("Gardiner") was driving the van. Id. at p. 27. The prosecutor showed Sergeant Fury a photograph of a black male, whom Sergeant Fury identified as being Ramar Gardiner; the photograph was admitted into evidence. Id. at pp. 27-28.

Gardiner presented Sergeant Fury with a rental agreement that listed the authorized driver as Marisol Cintron. Id. at p. 29. Sergeant Fury determined that none of the four men were authorized drivers of the van. Id. at p. 27. At some point thereafter, he informed the men that the vehicle would have to be towed and an inventory done of the vehicle. Id. at p. 37. He asked them to take any personal property that belonged to them prior to the van being inventoried. Id. The men then exited the van, Seraphin went to the back of the van and removed a large duffel bag, and the foursome walked to a nearby McDonald's restaurant. Id.

During the stop, Sergeant Fury observed a rectangular black safe between the center of the rear captain's chairs where Seraphin and Antoine were seated. Id. at p. 36. Prior to the four men exiting the van, he asked the men if the safe belonged to any of them. Id. at p. 37. No one responded to his question. Id. at p. 38.

Upon the police inventorying the contents of the minivan, it was determined that the safe was locked. Id. at p. 39. A search warrant was obtained for the safe. Id. at p. 38. Inside the safe, the police found eleven (11) plastic bags; each bag contained gift cards and receipts. Id. at p. 39. Also found in the safe were thirty-eight (38) credit cards wrapped in a rubber band. Id. The name on each of the credit cards was either "Sean Francis" or "Brandon Anderson." Id. at pp. 39-44.

Sergeant Fury was shown a photograph of a white minivan that was taken in the parking lot of a Giant Eagle grocery store in North Huntingdon, Pennsylvania on March 3, 2010. Id. at pp. 68-69. Sergeant Fury testified that it was similar to the minivan he stopped that night. Id. at p. 69.

### B. Testimony of Walmart employee Stephanie Rocco.

Bethel Park, Pennsylvania Walmart customer service manager, Stephanie Rocco ("Ms. Rocco"), testified at the trial to the following information. Ms. Rocco had an encounter with a black male in the Bethel Park, Pennsylvania Walmart store on March 3, 2010 around 8:50 p.m. when she was called over to the customer service desk by a fellow employee because a customer was trying to use credit cards to purchase a $1500 Walmart gift card, the transaction was not going through, and she was needed to cancel the transaction. September 12, 2012 transcript, pp. 6-7, 9. Ms. Rocco canceled the transaction and the customer left the store. Id. at pp. 9 and 15.

The customer was a male wearing a plaid jacket and glasses. Id. at p. 6. The prosecutor showed Ms. Rocco a photograph of a male; she identified the male in the photograph as being the man she dealt with at the service desk. Id. at p. 8.

Ms. Rocco had a second, brief encounter with another black male in the store that same night around 9:07 p.m. Id. at pp. 10, 12-13. Bernice Crampton ("Mrs. Crampton"), another Walmart employee who was working at a register that evening, called Ms. Rocco over because a customer was using a credit card to make a purchase and the customer's signature did not match the signature on the card. Id. at p. 10. The customer was a tall thin black male who was wearing a black baseball cap and dark coat. Id. at p. 11. He was attempting to purchase two notebook computers and two (2) iPods, and had tried to use seven different credit cards to make the $2558.25 purchase. Id. at pp. 12-13. All seven credit cards had been rejected. Id. at p. 14.

4

Ms. Rocco agreed with Mrs. Crampton that the customer's signature, "B. Anderson," did not match the signature on the credit card or the signature on the identification card the customer produced and so she voided the transaction. Id. at pp. 14-15. The customer then left the store. Id. at p. 15.

Because she found the activity of the two males to be suspicious, Ms. Rocco then alerted Walmart stores in West Mifflin, Carnegie, and Washington, Pennsylvania about what had transpired in her store, including giving a description of the two males. Id. at p. 16. At the Carnegie Walmart store she spoke with Darlene Kirsch. Id.

C. Testimony of Walmart employee Bernice Crampton.

Bethel Park, Pennsylvania Walmart employee Bernice Crampton testified at the trial to the following information. A few weeks before coming to court she reviewed a statement that she had made about the events that occurred on March 3, 2010 at the Bethel Park Walmart store, as well as some surveillance images from that evening. September 12, 2013 Transcript, pp. 42-43. She had viewed the video in March 2012, and she remembered what happened on March 3, 2010, two years earlier, without seeing the images. Id. at p. 43.

Mrs. Crampton stated that she had recognized a man she saw in the courthouse lobby earlier in the week of the trial as being the man she dealt with at the Walmart store on March 3, 2010; she then identified the man she saw in the lobby to be Antoine as he sat at counsel table. Id. at pp. 43-44. Mrs. Crampton also stated that looking at Antoine in the courtroom stimulated her memory because she had spent time looking at him when he was in the store; "I kind of remembered what he looked like and when I walked in the door and I saw him, I knew immediately it was him." Id. at p. 44.

5

Mrs. Crampton testified that she was working with Stephanie Rocco the evening of March 3, 2010 when she received a call from the cashier in the electronics department who said he needed help with a gentleman who was trying to purchase electronics and whose credit cards were not going through. Id. at p. 44. The customer then brought his items to the front register and she completed the transaction there. Id. at p. 45. Mrs. Crampton again identified Antoine as the gentleman making this purchase. Id. at p. 45.

The prosecutor showed Mrs. Crampton a receipt; she explained it from the transaction in question. Id. at p. 45. The customer had tried to use six different credit cards to purchase the items. Id. at p. 45. Then, although a seventh credit card the customer tried worked, she voided the transaction after she asked him for identification, and the signature on his out-of-state drivers' license did not match the signature on the credit card he was using. Id. at pp. 46-47. At this point, Mrs. Crampton walked over to the service desk where Ms. Rocco was located, told her what she had done, showed her the two signatures, and Ms. Rocco said "no, absolutely no way are we going to accept that sale." Id. at p. 47. Mrs. Crampton then told the customer of the decision to void the sale. Id.

Mrs. Crampton stated that, in total, her face-to-face encounter with the customer was about 15 to 20 minutes. Id. at p. 47. She described the customer as a black male, taller than her, wearing a baseball cap and a dark jacket. Id. at p. 49. The prosecutor showed Mrs. Crampton a photograph from the Bethel Park Walmart that had been introduced into evidence; she identified the person in the photograph as being the customer she dealt with.

Mrs. Crampton further testified that she was taking the merchandise from the voided sale back where it belonged when she got a phone call from Bob Dean of the Carnegie Walmart who wanted to know what was going on at the Bethel Park store. Id. at p. 49. Mrs. Crampton told

him about the encounter she had just had, and described the customer to Mr. Dean: "dark jacket, baseball cap." Id. at p. 49. Mr. Dean told her that he believed that that same customer was at the service desk in his store and he hung up the phone on her. Id. at pp. 49-50.

On cross-examination, Mrs. Crampton stated that she thought that the events at issue occurred in August 2010. Id. at p. 54. She also testified that the cashier in the electronics department who had been assisting this customer was Jarrett. Id. at p. 57. Her recollection was that the merchandise the customer was attempting to purchase was a computer, an iPod, and some computer games. Id. at p. 58. Mrs. Crampton could not recall who was the cashier at the front register where she encountered the customer, but she recalled telling the cashier to ring up the merchandise. Id. at p. 60. Mrs. Crampton also testified that Jarrett had told her that the customer had tried four different credit cards unsuccessfully before they brought the items to the front of the store. Id. at p. 62.

Defense counsel asked Mrs. Crampton what the photograph looked like on the driver's license the customer showed her; Mrs. Crampton said "just looked like him" and indicated to Antoine at counsel table. Id. at p. 70.

Mrs. Crampton also testified that the customer was not by himself; a black male friend was with him. Id. at p. 77. She said the two men left the store together. Id. at p. 78.

Mrs. Crampton explained that she had written a statement about what happened a couple of months after the incident. Id. at p. 80. The statement was given to Special Agent Radens who came to speak to her twice. Id. at p. 82-83. The first time she met with Special Agent Radens, he asked whether she had a description of the customer; he did not show her any photos. Id. at p. 83. Mrs. Crampton told him it was a tall thin black man and that she might be able to identify him. Id. at pp. 83, and 86-87. The second time she met with Special Agent Radens, he showed her two

7

or three photographs. Id. at p. 89. One photograph was of a gentleman in a plaid jacket; she had

never seen him before. Id. Mrs. Crampton did not think he was the man who was with the

customer she dealt with. Id.

### D. Testimony of Walmart employee Darlene Kirsch.

Carnegie, Pennsylvania Walmart employee Darlene Kirsch ("Ms. Kirsch") testified at the

trial to the following information. Ms. Kirsch received a call from Ms. Rocco of the Bethel Park

Walmart about suspicious activity that had occurred at the Bethel Park store: specifically, Ms.

Rocco told Ms. Kirsch that two black males, tall, lean in composure, one in a white jacket with

checkers and the other in a black coat and baseball hat, would come into the store, one would go

to electronics and try to obtain high-end items, while the other would try to obtain high dollar

gift cards. September 12, 2012 transcript, p. 103.

Ms. Kirsch testified that thereafter, around 9:57 p.m., at the Carnegie store, Ms. Kirsch

had an encounter with a male customer wearing a plaid jacket who was trying to purchase two

$1500 Walmart gift cards with a Capital One credit card and an out-of-state id. Id. at p. 103,

105. The prosecutor showed a videotape of this transaction to the jury. Id. at p. 105. The

videotape showed, and Ms. Kirsch testified to the fact that ultimately, even though the credit card

transaction was approved, in the end, the customer decided he did not want to continue with the

transaction. Id. at p. 110. Ms. Kirsch explained to the customer that because the transaction was

for such a large amount, even though the credit card went through, she needed an override from a

manager to complete the transaction. Id. At that point, the customer, who had been texting on

his phone throughout the transaction, left the store. Id. Ms. Kirsch then voided the transaction.

Id. at p. 111.

Ms. Kirsch testified that during this same time period, another black male customer was in the electronics department trying to purchase iPods and a notebook computer. Id. at p. 112. A sales receipt was admitted into evidence that showed the customer tried to use six credit cards to purchase iPods and an HP computer for $1907. Id. at pp. 113, 116. The prosecutor showed a videotape of this transaction to the jury as well. Id. at p. 114. During the transaction, the customer was texting on his phone. Id. at p. 117.

At some point in time while these events with the two customers were transpiring, Ms. Kirsch alerted Mr. Dean to the events and Mr. Dean followed one of the men out the exit. Id. at p. 120.

### E. Testimony of Carnegie, Pennsylvania Walmart employee Bethany Cummings.

Carnegie, Pennsylvania Walmart employee Bethany Cummings ("Ms. Cummings") also testified during the trial to the following information. She was the employee who was working the electronics register when a black male attempted to purchase three iPods and a notebook computer. September 12, 2012 transcript, p. 136. Ms. Cummings testified that the customer tried to pay for the purchase with six different credit cards, none of which worked. Id. at pp. 138, 140. Ms. Cummings asked the customer for identification because his transactions were not going through; he seemed very suspicious, was very nervous and seemed in a hurry. Id. at p. 138. Ms. Cumming's recollection was that his identification said that his name was "Brian Anderson" or with a "B" and that the identification was from Massachusetts. Id. at p. 139. She also recalled, but was not sure, that the man had a gold tooth. Id. at p. 140. When reminded by the prosecutor that she had written in a statement on or about March 10, 2010, that the customer had a gold tooth, she said that "if it's on the statement then that's correct." Id. at pp. 140-141.

F. Testimony of Carnegie, Pennsylvania Walmart employee Robert Dean.

Carnegie, Pennsylvania Walmart employee Robert "Bob" Dean ("Mr. Dean") testified at the trial to the following information. Mr. Dean called 911 and followed the male with the plaid jacket out of the store and saw him get into a white minivan which was parked in the Walmart parking lot. September 12, 2012 transcript, pp. 156, 159-160, and 174. Mr. Dean told the 911operator that they had received a call from the Bethel Park Walmart about suspicious credit card activity and that one of the guys was in his store. Id. at p. 175. That was the only man Mr. Dean saw get into the van. Id. at p. 174. Mr. Dean testified that he could see the license plate of the minivan, which was a Florida plate, of the minivan; he wrote the plate number down on his hand. Id. at pp. 161and 166. Ultimately, Mr. Dean saw the police stop the van in which he had observed the male entering. Id. at p. 162.

The prosecutor showed Mr. Dean a photograph of a white minivan that was taken in the parking lot of a Giant Eagle grocery store in North Huntingdon, Pennsylvania on March 3, 2010. Id. at p. 165. Mr. Dean testified that the minivan in the photograph looked similar in appearance to the minivan he saw that evening. Id. at p. 165.

G. Testimony of Carnegie, Pennsylvania Walmart employee Tracy Sazewczyk.

Carnegie, Pennsylvania Walmart employee Tracy Sazewzyk ("Ms. Sazewzyk") testified at the trial to the following information. Ms. Sazewzyk is an asset protection manager at the Carnegie store; relevant to the March 3, 2010 transactions, she gathered video and information from the electronic journals at the Carnegie Walmart for the police and provided contact information to the police regarding other Walmart stores. September 12, 2012 transcript, pp. 186 and 189. Ms. Sazewzyk testified with respect to how credit card transactions are conducted at Walmart stores in general. Id. at pp. 190-192. Ms. Sazewzyk also testified at length about an

exhibit introduced into evidence by the Government that she had provided the information for; this exhibit listed all of the Walmart stores in the Western Pennsylvania area that on March 3, 2010 had customers attempt to purchase merchandise or gift cards using credit cards in the name of either Brandon Anderson or Sean Francis. Id. at p. 194-214.

The first store Ms. Sazewzyk discussed was the Latrobe Walmart, Store #2052. She explained that a City Bank Visa ending in 3383 in the name of Sean Francis was used to purchase gift cards and a $100 prepaid phone card, for a total of $3104.31. Id. at 195. A Citibank Visa ending in 3383 in the name of Sean Francis was found by the police in the black safe left in the white minivan after Sergeant Fury stopped it as it was exiting the Raceway Plaza parking lot. September 11, 2012 transcript, p. 43. A Walmart signature receipt for the transaction was admitted into evidence. September 12, 2012 transcript, pp. 195-196.

The second store Ms. Sazewzyk discussed was the Greengate Walmart, Store #2059. She explained that at 12:49 p.m. a Visa ending in 7870 in the name of Brandon Anderson was used to purchase American Express gift cards. Id. at 196. A Walmart electronic journal and signature receipt for the transaction were admitted into evidence; this transaction was for $1478.96. Id. at p. 196.

Ms. Sazewzyk then explained that at 1:15 p.m., also at the Greengate Walmart, a customer attempted at register number 67 to use four Visas, a Visa Platinum ending in 4986, a Visa ending in 3268, an Amazon.com Visa ending in 8191, and a US Bank Visa ending in 1599, to purchase gift cards and an HP notebook computer. Id. at p. 197. That customer then used a Visa ending in 6545 in the name of Brandon Anderson to purchase these gift cards and an HP notebook computer. Id. at p. 197. Walmart electronic journals were admitted into evidence for all of the attempted transactions as well as a Walmart signature slip in the name of B. Anderson

was admitted into evidence for the successful transaction. Id. at pp. 197-198. The Visa credit cards ending in 4986, 8191 and 1599, all issued in the name of Brandon Anderson, were found in the safe left in the white minivan. September 11, 2012 transcript, p. 42.

Ms. Sazewzyk next explained that at 1:18 p.m., at the Greengate Walmart, a Visa ending in 3268 in the name of Brandon Anderson was used at register 67 to purchase a candle set, photo albums, spangles, Jordan Almonds, two heart pillows, guest books, favor kits, candy, a cake topper and a candle holder. September 12, 2012 transcript, p. 199. A Walmart electronic journal and receipt for the transaction were admitted into evidence. Id. at. p. 200. That same Visa was then used in a third transaction at register 67, at 1:19 pm, to purchase $1500 worth of gift cards. A Walmart electronic journal and receipt for the transaction were admitted into evidence. Id. at p. 201.

Video surveillance from the Greengate Walmart was admitted into evidence through Ms. Sazewczyk's testimony. One scene was of a white minivan in the store's parking lot. Id. at p. 201-202. The second scene was of the transactions on register 67 where a black male wearing a white hat and a bluish gray coat can be seen attempting to use and using a number of credit cards to make three purchases. Id. at pp. 201-204.

The third store Ms. Sazewzyk discussed was the West Mifflin Walmart, Store #2281. She explained that at 6:20 p.m. a customer attempted at register number 17 to use four credit cards to purchase V-necks, t-shirts, socks, instant chargers, a magazine and gift cards. Id. at pp. 205 and 230. Three of the credit cards were Visas: (1) a Credit One Bank Visa ending in 7678; (2) a Capital One Visa ending in 2021; and (3) a Capital One Visa ending in 9879. Id at pp. 205-206. Ultimately the customer successfully used a Citibank Visa ending in 4480 in the name of Brandon Anderson to buy the goods. Id. at p. 206. A Walmart electronic journal for the

successful transaction was admitted into evidence. Id. The customer then successfully used the Citibank Visa ending in 4480, issued in the name of Brandon Anderson, to buy a $1000 Walmart gift card. Id. at p. 207. A Walmart signature receipt in the name of B. Anderson and an electronic journal for this successful transaction was admitted into evidence. Id. Visas ending in 7678, 2021, and 9879, issued in the name of Brandon Anderson, were found in the safe left in the white minivan. September 11, 2012 transcript, pp. 39-43.

The fourth store Ms. Sazewzyk discussed was the Bethel Park Walmart, Store #5381. She explained that at 8:50 p.m. a customer attempted at register number 92 to use three credit cards to buy 15 gift cards. Id. at p. 205. All three attempts were unsuccessful. Id. at 208. The credit cards involved were two Mastercards ending in 0553 and 7147 and a Capitol One Visa ending in 8428. Id. All were issued in the name of Sean Francis and were found in the safe left in the white minivan. September 11, 2012 transcript, p. 43-44. A Walmart electronic journal for the three unsuccessful transactions was admitted into evidence. September 12, 2012 transcript, p. 208.

Ms. Sazewzyk discussed a second series of transactions at the Bethel Park Walmart. She explained that at 9:07 p.m., a customer attempted at register number 12 to purchase two HP notebooks, three iPods and three (3) PSP games. Id. at p. 209. This customer attempted to use six credit cards before the seventh credit card was approved by the issuing bank. Id. at pp. 208-09. The six credit cards involved that were unsuccessful were Visas ending in 9803, 6398, 4790, 6015, 1374, and 7676. Id. at pp. 209-210. All six of these cards were found in the safe in the white minivan. September 11, 2012 transcript, pp. 41- 42. A Visa ending with 1612 was the credit card that was approved by the issuing bank; it was issued in the name of Brandon

Anderson. September 12, 2012 transcript, p. 210. A Walmart electronic journal for the seven transactions at register 12 was admitted into evidence. Id.

The final Walmart store Ms. Sazewzyk discussed was the Scott Township/Carnegie Walmart, Store #5040. She explained that at 9:57 p.m., a customer attempted unsuccessfully to purchase two $1500 gift cards. Id. at p. 213. A Walmart electronic journal for this transaction was admitted into evidence. Id. She further explained that a customer unsuccessfully attempted six times at register 67 to purchase three iPods and an HP notebook. Id. Ultimately the transaction was aborted and cancelled. Id. This is the transaction that Bethany Cummins testified about at the trial.

### H. Testimony of Jim Rozorbil.

Jim Rozorbil ("Mr. Rozorbil"), a Giant Eagle loss prevention employee, testified at the trial to the following information. He participated in collecting video surveillance for a number of Giant Eagle stores from March 3, 2010. September 13, 2012 transcript, p. 11. Mr. Rozorbil explained that he had produced the surveillance videotapes that were Government exhibits GE-64C, GE-73A, GE-9B and A, GE-9C, GE-73B, GE-10, GG-3010, GE-64A and B and GE-81A. Id. at p. 13. Mr. Rozorbil also testified that he provided Michelle DiGiacomo, a fellow Giant Eagle employee, with video taken in Giant Eagle stores on March 3, 2010 that corresponded with a transaction summary that Ms. DiGiacomo prepared. Id. at p. 19.

### I. Testimony of Michelle DiGiacomo .

Michelle DiGiacomo ("DiGiacomo"), supervisor of Giant Eagle's retail banking department, testified at the trial to the following information. Ms. DiGiacomo oversees any electronic payments made in Giant Eagle stores. September 13, 2012 transcript, p. 24. Ms.

DiGiacomo explained that a manager has to approve any purchase that exceeds $1000. Id. at p. 29.

Ms. DiGiacomo created transaction summaries for purchases made at certain Giant Eagle stores on March 3, 2010, and testified about their contents. The first transaction Ms. DiGiacomo discussed was with respect to the Giant Eagle located in Ligonier, Pennsylvania. Id. at p. 32. There, at 9:39 a.m., a customer used a Visa card ending in 7870, in the name of Brandon Anderson, at the service desk, to purchase six Best Buy Gift Cards for a total of $3000. Id. at p. 32. A Giant Eagle receipt for this transaction was admitted into evidence. Id. at pp. 32-33.

The second transaction Ms. DiGiacomo discussed was with respect to the Giant Eagle located in Latrobe, Pennsylvania. Id. at p. 33. There, at 11:03 a.m., a customer used a Visa card ending in 9809, in the name of Brandon Anderson, at the service desk, to purchase four Best Buy Gift Cards for a total of $2000. Id. A Giant Eagle receipt for this transaction was admitted into evidence. Id. Ms. DiGiacomo then discussed four unsuccessful attempts at the Latrobe store by a customer, using credit cards ending in 9809, 3804, 0634 and 8315, to make a $3000 purchase. Id. at p. 33. Visa cards ending in 3804 and 0634 in the name of Brandon Anderson were found in the black safe in the minivan. September 11, 2012 transcript, pp. 42 and 44. Finally, Ms. DiGiacomo explained that a Visa credit card ending in 3268 was used at the service desk to purchase six Best Buy Gift Cards for a total of $3000. September 13, 2012 transcript, pp. 33-34. A Giant Eagle receipt for this transaction was admitted into evidence. Id. at p. 34. The signature on the receipt was B. Anderson. Id. at p. 34. Listed on the Giant Eagle receipt were the gift card numbers associated with the six Best Buy Gift Cards. Id. Six Best Buy Gift Cards with the same numbers were found in the black safe left in the minivan. Id. at pp. 34-35.

The next transaction Ms. DiGiacomo testified about occurred at a Get Go located in Latrobe, Pennsylvania. Id. at p. 35. There, at 11:28 a.m., a customer used a Visa card ending in 0634, in the name of Brandon Anderson, to purchase four Visa Gift Cards and four American Express Gift Cards for a total of $549.50. Id. A Get Go receipt and journal transaction for this transaction were admitted into evidence. Id. at p. 36.

The next transactions Ms. DiGiacomo testified about were with respect to a Giant Eagle located in Greensburg, Pennsylvania. Id. at p. 35. There, starting at 12:00 p.m., a customer unsuccessfully tried twice to swipe Visa cards, one ending in 0470 and the other ending in 3383 to purchase six Best Buy Gift Cards for a total of $3000. Id. Visa cards ending in 0470 and 3383 were found in the black safe left in the minivan; the cards bore the name Sean Francis. September 11, 2012 transcript, p. 43. The customer then successfully used a Visa ending in 9177 to purchase the six Best Buy Gift Cards for a total of $3000. September 13, 2012 transcript, pp. 36-37. A Visa ending in 9177, with the name Sean Francis on it, was found in the black safe in the minivan. September 11, 2012 transcript, p. 43. A Giant Eagle receipt and journal transaction for the successful transaction was admitted into evidence. September 13, 2012 transcript, p. 37.

Video surveillance evidence was admitted into evidence that showed two black males, one with a plaid jacket on and one wearing a baseball cap and tan jacket, entering the Greensburg Giant Eagle as well as the black male wearing the plaid jacket engaged in a transaction that involved a counterfeit credit card. Id. at pp. 41-45.

At this same Greensburg, Pennsylvania Giant Eagle, at 12:11 p.m., a customer tried unsuccessfully to use a Visa ending in 3615 to purchase seven Best Buy Gift Cards and five Nordstrom Gift Card for a total of $4004.99. Id. at p. 38. A Visa ending in 3615 was found left in the safe in the minivan. September 11, 2012 transcript, p. 403. The customer then

16

successfully made the purchase with a Visa ending in 6183. September 13, 2012 transcript, p. 38. A Giant Eagle receipt for the successful transaction, signed by B. Anderson, was admitted into evidence. Id.

Again at the Greensburg, Pennsylvania Giant Eagle, at 12:16 p.m. at register 7, a customer tried unsuccessfully to use three Visa credit cards ending in 5529, 9065, and 3615 to purchase four Best Buy Gift Cards and five Nordstrom Gift Card for a total of $2500. Id. at p. 38. Visa credit cards ending in 5529, 9065, and 3615 were found left in the safe in the minivan; the card ending in 5529 bore the name Sean Francis and the other two cards bore the name Brandon Anderson. September 11, 2012 transcript, p. 40-41. The customer then successfully purchased $2500 in gift cards using a Visa ending in 3268. September 11, 2012 transcript, p. 40. A receipt for the successful transaction, signed by B. Anderson, was admitted into evidence. Id.

The next transactions Ms. DiGiacomo testified about were with respect to a Giant Eagle located at Hempfield Square, Pennsylvania. Id. at p. 45. Beginning at 1:45 p.m. a customer tried unsuccessfully three times to use Visa credit cards ending in 5157, 9177, and 5498 to purchase eight Best Buy Gift Cards for a total of $4000. Id. Visa credit cards ending in 9177 and 5496, in the name of Sean Francis, were found in the safe left in the minivan. September 11, 2012 transcript, p. 43. The customer then successfully purchased six Best Buy Gift Cards for a total of $3000 and two Best Buy Gift Cards for a total of $1000, in two separate transactions, using a Visa card ending in 6545. September 13, 2012 transcript, p. 46. A Giant Eagle receipt and electronic display for the $3000 transaction and an electronic display for the $1000 transaction were admitted into evidence. Id. at p. 47.

Video evidence and still photos made from the video taken at the Hempfield Square Giant Eagle were introduced into evidence. Id. at pp. 48-50. These items show two black males

in the store, one wearing a Steelers baseball cap and light colored jacket, and the other wearing a plaid jacket; also shown is the male in the plaid jacket engaged in the transaction at the register that involved using counterfeit credit cards. Id. at pp. 49-50. Ms. DiGiacomo testified that the one black male was the same person who had appeared in the video from the Greensburg Giant Eagle, just wearing a different hat. Id. at p. 49.

The next transactions Ms. DiGiacomo testified about were with respect to a Giant Eagle and Get Go located in North Huntingdon, Pennsylvania. Id. at p. 50. Beginning at 4:18 p.m. a customer at the Giant Eagle tried unsuccessfully to use a Visa credit card ending in 3510 to purchase six Best Buy Gift Cards for a total of $3000. Id. at p. 51. The customer then used a Visa credit card ending in 4997 to purchase the cards. Id. A Giant Eagle receipt for the $3000 transaction was admitted into evidence. Id. There were four other declined transactions at that store in the name of Brandon Anderson. Id. at p. 52, 55. Additionally, at 4:42 p.m. a customer at the North Huntingdon Get Go, which is located in the parking lot of the North Huntingdon Giant Eagle store, used a Visa credit card ending in 3251 to purchase washer fluid and six Home Depot Gift Cards for a total of $3003.17. Id. at p. 52. A Giant Eagle receipt for the $3003.17 transaction was admitted into evidence; the receipt was signed by S. Francis. Id.

Video surveillance from the North Huntingdon Giant Eagle and still photographs made from the video were admitted into evidence; they showed two black males, one wearing a black jacket and one wearing a red baseball cap and dark jacket. Id. at pp. 52-55. Ms. DiGiacomo testified that the man in this video was the same man as in in earlier video. Id. at pp. 53-54.

Video surveillance of the parking lot of the North Huntingdon Get Go, as well as a photograph made from the video, was admitted into evidence at the trial; they showed a black male in a plaid jacket. Id. at pp. 55-56. Ms. DiGiacomo testified that the video showed a white

Caravan/Dodge minivan pulling into the lot at 4:28 p.m. and an individual who had been seen in other video stills exiting the van. Id. at p. 56. Video surveillance evidence of the transaction at the North Huntingdon Get Go, as well as a photograph made from the video, also was admitted into evidence at the trial; again, they showed a black male in a plaid jacket. Id. at p. 57-58.

The next transactions Ms. DiGiacomo testified about were with respect to a Giant Eagle located in McKeesport, Pennsylvania. Id. at p. 58. Video surveillance evidence from this store, as well as photographs made from the video, showed the same two black males, one in a plaid jacket and one wearing a red and black ball cap and dark jacket, in the store. Id. at pp. 60-61. Beginning at 5:23 p.m., a customer used a Visa credit card ending in 4053 to purchase two Best Buy Gift Cards. Id. at p. 51. A Visa card ending in 4053 in the name of Brandon Anderson was found in the safe left in the minivan. September 11, 2012 transcript, p. 44. A Giant Eagle receipt and electronic display for the transaction were admitted into evidence. September 13, 2012 transcript, p. 59. The electronic display showed that B. Anderson signed for the transaction. Id. There was video surveillance evidence, and a photograph made from the video, admitted into evidence; they showed a dark-colored hand involved in the transaction. Id. at p. 61.

Ms. DiGiacomo testified that there were also declined transactions at the same store on Lane 1. Id. at p. 61. A Giant Eagle electronic display for the transaction was admitted into evidence. Id. It showed that a customer attempted to purchase six Best Buy Gift Cards for a total of $3000. Id. Video of this transaction, and a photograph made from the video, were admitted into evidence at the trial; they showed the same black male in a plaid jacket as was in earlier videos and photographs. Id. at p. 62.

The next transactions Ms. DiGiacomo testified about were with respect to a Giant Eagle located in West Mifflin, Pennsylvania. Id. at p. 64. Beginning at 6:47 p.m., and ending at 7:09

p.m., a customer tried fifteen times, always unsuccessfully to make purchases with credit cards. Id. at pp. 64-65. The first purchase was an attempt to purchase one Best Buy gift card for $500; a Giant Eagle electronic display was admitted into evidence with regard to this transaction. Id. at p. 65. Two times the customer was able to successfully use a Visa credit card ending in 4480 to purchase Best Buy gift cards. Id. The first time he used the Visa to purchase 4 Best Buy gift cards worth $1500. Id. A Giant Eagle electronic display for this transaction, with the signature of B. Anderson on it, and a corporate generated receipt were introduced into evidence. Id. at p. 66. Video and a photograph of this transaction were admitted into evidence; they showed the customer was a black male wearing a red baseball cap with the number "18" on it and a dark jacket. Id. at pp. 66-68. The second time the customer used the Visa credit card to buy one Best Buy gift card worth $500. Id. at p. 65. At this Giant Eagle store, the total amount of successful purchases was $2000 and total amount of unsuccessful attempts was $21,500. Id. at p. 68.

The last four transactions Ms. DiGiacomo testified about were with respect to a Giant Eagle store located in Brentwood, Pennsylvania and Giant Eagle store located in Caste Village, Pennsylvania between 7:40 p.m. and 8:20 p.m. Id. at p. 69. All of the transactions were unsuccessful. Id. A Giant Eagle electronic display was introduced into evidence for one of the unsuccessful transactions; it was for an attempt to buy five (5) Best Buy gift cards for a total of $2500 using a Visa ending in 4790 in the name of Sean Francis. Id. The transaction was declined and the order cancelled. Id.

Finally, Ms. DiGiacomo testified that at all eleven of the Giant Eagle stores she testified about, the credit cards used were either in the name of B. Anderson or S. Francis. Id. at p. 88.

J. Testimony of Douglas Burek.

Douglas Burek ("Officer Burek"), a Scott Township police officer, testified at the trial to the following information. Officer Burek was one of the police officers involved in the stop of the white minivan at the Raceway Plaza in Carnegie on March 3, 2010. September 13, 2012 transcript, p. 135. The prosecutor showed Officer Burek a photograph of a white minivan in the parking lot of the Walmart in Greensburg; Officer Burek testified that it looked similar to the minivan he stopped in Carnegie. Id. With respect to the stop of the minivan, Officer Burek testified that the area was well-lit where the van was stopped and that he took Brent Kevin Hercules Antoine out of the van. Id at pp. 137-138. Officer Burek also testified that he recognized Defendant Seraphin at the defense table in the courtroom as one of the male passengers in the back of the minivan. Id. at p. 138. Officer Burek then testified that the person he removed from the van was the defendant Antoine that was seated at defense table. Id.

Officer Burek explained that later in March, 2010, Special Agent Radens showed him several photographs at his police headquarters. Id. at p. 144. Officer Burek showed Special Agent Raden one of the photos and told him that he could not say for sure whether that was the individual he dealt with during the traffic stop; the individual in the picture could have been the male he took identification from during the stop on March 3, 2010 maybe at a different time in that man's life, but that he could not be sure. Id. at p. 145. The name Antoine, Brentt, K. was on the photograph he identified. Id. at p. 146.

Officer Burek also testified that in January 2011, Special Agent Radens showed him one photograph; Officer Burek immediately identified the man in the photo as being the man he dealt with on March 3, 2010. Id. at p. 147. The photograph was admitted into evidence. Id. at p. 148.

### K. Testimony of Special Agent Michael Radens.

Finally, Special Agent Michael Radens ("Special Agent Radens"), a Special Agent for the Homeland Security Investigations and the case agent for this case, who formerly was a Secret Service agent, testified at the trial to the following information. Special Agent Radens testified that they took one of the credit cards found in this case and swiped it through a card reader and found that the numbers on the front of the card were the same as on the magnetic strip on the back of the card, which meant that the card was counterfeit. September 14, 2012 transcript, p. 18.

Special Agent Radens further testified that the credit cards admitted into evidence are all counterfeit. Id. at pp. 23-24. He explained that he knew they were counterfeit because the bank identification number was not correct on the cards, the hologram placement was wrong, and the foiling was incorrect. Id.

Special Agent Radens also testified about a certified copy of a marriage license from New York that stated that Mr. Antoine was married on March 5, 2010. Id. at p. 26. A wedding photograph of Antoine was admitted into evidence; Agent Radens testified that he could see something shiny in Antoine's mouth in the picture. Id. at p. 27.

Special Agent Radens further testified that Mr. Antoine's birthdate is January 10, 1977 and that he is five (5) feet nine (9) inches tall. Id. at pp. 27, 50-51.

Special Agent Radens also testified that when he first saw the videos introduced throughout the trial from the various Walmart and Giant Eagle stores, he thought there were four different individuals in the video: Richard Foster, who was wearing the plaid coat, and then three other individuals. Id. at p. 38. But after he watched the videos over and over again, he came to the conclusion that there were only two individuals in the videos, and that the second male just

22

continued to change his appearance in the store. Id. at pp. 38-39. He determined that it was the same gentlemen in the various videos because the man's jeans and shoes did not change and it was the same basic goatee in every video. Id. at p. 39.

Special Agent Radens testified that they did not fingerprint the safe left in the minivan because it is rigid and they cannot get a fingerprint from a rigid item. Id. at p. 40. They tried fingerprinting one credit card; it was analyzed and there were no identifiable fingerprints on the card. Id. at p. 41. Special Agent also testified, on cross examination, that it was not one of his duties to examine fingerprints; "there are experts for that." Id. at p. 20.

Special Agent Radens testified that the photograph shown to the grand jury was not of Mr. Antoine, but of another individual, Brentt K. Antoine, who also resided in Brooklyn, New York. Id. at p. 70.

Special Agent Radens also testified that when, on January 25, 2011, he showed Officer Burek, the photograph of Mr. Antoine taken at the time of his arrest earlier in January, 2011, Officer Burek said that he was the guy Officer Burek had dealt with. Id. at p. 88.

Special Agent Radens testified that in March 2012 he showed Mr. Antoine's arrest photograph to Bernice Crampton, the Bethel Park Walmart employee, and she then told him that was definitely the man she dealt with on March 3, 2010. Id. at pp. 93-94.

Special Agent Radens testified that Seraphin is not in any of the videos from March 3, 2010. Id. at p. 104. He also testified that there were smooth surfaces on the safe around the place where you open the safe (right above the lock) and on the inside top lid of the safe. Id. at p. 106.

**III. Standard of Review.**

Mr. Antoine moved under Fed.R.Crim.P. 29, at the close of the government's case-in-chief, for a judgment of acquittal. Because the Court reserved its judgment on the motion, we

limit our inquiry to the evidence submitted to the jury at that point in the trial. See Fed.R.Crim.P. 29(b); United States v. Boria, 592 F.3d 476, 480 n. 7 (3d Cir.2010). Moreover, the Court "must consider the evidence in the light most favorable to the government and affirm the judgment if there is substantial evidence from which any rational trier of fact could find guilt beyond a reasonable doubt." United States v. Gatlin, 613 F.3d 374, 380 (3d Cir.2010) (internal quotation marks omitted). "The burden on a defendant who raises a challenge to the sufficiency of the evidence is extremely high." United States v. Starnes, 583 F.3d 196, 206 (3d Cir.2009) (internal quotation marks omitted). A finding of insufficiency should be "confined to cases where the prosecution's failure is clear." United States v. Smith, 294 F.3d 473, 477 (3d Cir.2002) (internal quotation marks omitted). The Court may not "usurp the role of the jury by weighing credibility and assigning weight to the evidence, or by substituting its judgment for that of the jury." United States v. Brodie, 403 F.3d 123, 133 (3d Cir.2005).

**IV. Legal Analysis.**

As stated, in support of his motion for judgment of acquittal, Mr. Antoine contended that the government had not presented sufficient evidence for the jury to find beyond a reasonable doubt that it was he (Defendant Brent Kevin Hercules Antoine) who committed any criminal acts on March 3. 2010. September 14, 2012 Transcript, pp. 116-121. In support of his position, Antoine first argued that Officer Burek's positive identification of Antoine when showed Antoine's booking photograph in January, 2011 should be disregarded. Id. at pp. 116-117. Antoine next contended that Bernice Crampton's identification of Antoine was suspect because: (1) she testified that she had never been shown any photographs of Antoine prior to testifying, when in fact, Special Agent Radens subsequently testified that he had shown Mrs. Crampton Antoine's arrest photograph in March 2012; (2) she testified that there were two men at the

register when all the rest of the evidence of the conspiracy indicated that the two men would split up while in the stores; and (3) she testified that there was another cashier present during the transaction at issue, but could not remember who was that cashier. Id. at pp. 117-119. Mr. Antoine next argued that given Special Agent Raden's testimony that he did not know at first that there were only two men in the photographs and that because the man who was not Richard Foster kept changing his clothes, he had to look at the video numerous times before he realized that it was the same man changing his clothes, the jury, watching the videos played in court once, could not have concluded that the male in the videos who was not Richard Foster was Defendant Antoine. Id. at p. 119. Antoine also argued that the government did not conduct any fingerprinting or other type of hand exemplar to support any type of identification. Id. Finally, he argued that Special Agent Radens told the grand jury on November 30, 2010, that the individual at issue was Brentt K. Antoine, and showed them a photograph of Brentt K. Antoine. Id. at pp. 119-120. They also issued an arrest warrant for Brentt K. Antoine. Id. at p. 120.

In response, the United States argued that there was sufficient evidence introduced during its case-in-chief to establish that it was Mr. Antoine who was involved in the events of March 3, 2010. First, it pointed to the answers provided by the male questioned by Officer Burek: a name, Brent Kevin Hercules Antoine, Defendant Antoine's name, an address of 100 East 21st Street, Brooklyn, New York, age 33, and a date of birth January 10, 1977, Defendant Antoine's birthdate. Id. at p. 122-123. Second, the United States cited the videotapes shown to the jury and entered into evidence as showing a black male who has been consistently described as being a dark skin, black male, 5"10 or 5"11, and maybe with a goatee; they further argued that having seen these videos and pictures of Richard Foster and Ramar Gardiner and having observed Jean Seraphin in court, the jury could conclude that the black male in the videos was Defendant

Antoine and not any of the other three men located in the minivan when it was stopped by the police. Id. at pp. 123-124. Third, the Government cited to the two positive identifications of Defendant Antoine, the first being by Officer Burek, a professional law enforcement officer, who saw up close the black male whose identification information he took on March 3, 2010, and who when shown the booking photograph of Defendant Antoine in 2011, "said immediately, that's the guy I saw" on March 3, 2010. Id. at p. 124. Fourth, the Government cited to the wedding certificate of Defendant Antoine from March 5, 2010, which gives his birthdate of January 10, 1977, the same birthday given by the individual who told Officer Burek on March 3, 2010 that he was Brent Kevin Hercules Antoine. Id. at pp. 124-125. Fifth, the Government cited the purchase of wedding items with one of the counterfeit credit cards two days before Defendant Antoine got married; "[t]hat's an enormously strong inference for a jury to consider whether that was the guy in the car that night and in the store." Id. at p. 125. Finally, the Government cited Bethany Cummings' testimony that the man she dealt with on March 3, 2010 had a gold tooth in his mouth and in Defendant Antoine's wedding photograph something shiny can be seen in his mouth. Id.

In rebuttal, Mr. Antoine argued with respect to Officer Burek's identification of Mr. Antoine, that as the Court ruled when denying his motion to suppress Officer Burek's identification of Defendant Antoine, the manner in which Officer Burek was shown the photographs of Brentt K. Antoine and Mr. Antoine was unduly suggestive. Id. at p. 126. Defendant Antoine also argued with respect to the information given to Officer Burek on March 3, 2010, that the police officer did not testify that he was told by the man he questioned that he was thirty-three (33) years old; that information was computer generated. Id. at p. 127. Finally, Defendant argued that the address provided was not the same, the telephone number provided

was not valid, and the government had two dates of birth, the wrong Social Security number, and the wrong height. Id. at p. 127.

Viewing the evidence presented by the Government during the trial in its totality and in the light most favorable to the government, we find that there was substantial evidence, in the form of eyewitness testimony, video surveillance (and still photographs created from these videos), and documentary evidence, from which any rational trier of fact could have found beyond a reasonable doubt that it was, in fact, Mr. Antoine who was involved in the illegal conduct that occurred on March 3, 2010 that formed the basis for the superseding indictment filed against him. Specifically, there was the identification of Mr. Antoine by Officer Burek, who identified Mr. Antoine in court as being the gentleman he questioned during the traffic stop of the white minivan on March 3, 2010 near the Carnegie Walmart. There also was the identification of Mr. Antoine by Mrs. Crampton, who identified Mr. Antoine in court as being the gentleman she dealt with on March 3, 2010 at the Bethel Park, Pennsylvania Walmart who tried unsuccessfully to make a purchase using credit cards that ultimately were found to be counterfeit. With respect to Mrs. Crampton's testimony, while the defense is correct that Mrs. Crampton failed to recall that Special Agent Radens had shown her a photograph of Mr. Antoine sometime in 2011, the jury still was entitled to believe her testimony that she recognized Mr. Antoine in court as being the man she dealt with on March 3, 2010. As stated above, the Court may not "usurp the role of the jury by weighing credibility and assigning weight to the evidence, or by substituting its judgment for that of the jury." Brodie, 403 F.3d at 133.

Additionally, there were numerous video surveillance tapes and photographs from the various Giant Eagle and Walmart stores that were admitted into evidence at trial that showed a black male who was wearing a variety of baseball caps and jackets in these stores on March 3,

27

2010 either: (1) near the time the black male in the plaid jacket was using or attempting to use counterfeit credit cards to buy gift cards and merchandise; or (2) using counterfeit credit cards himself. As pointed out by the government, given that the black male in these videos and photographs resembled Mr. Antoine and did not resemble any of the other three (3) men who were in the minivan when it was stopped by Sergeant Fury (the jury had been shown photographs of Gardiner and Foster and Serphin was in the courtroom), any rational trier of fact could have determined that the black male in these videos and photographs was Mr. Antoine.

Finally, the documentary evidence introduced at the trial from which any rational trier of fact could have determined that it was Mr. Antoine who was present during the criminal acts that took place on March 3, 2010 in the Walmart and Giant Eagle stores were: (1) Mr. Antoine's March 5, 2010 marriage certificate which showed that his birthdate was, in fact, January 10, 1977, the same birthdate provided by the man whom Officer Burek questioned on March 3, 2010 during the traffic stop; and (2) the receipt from the Greengate Walmart that showed that numerous wedding-related items were purchased on March 3, 2010 using a credit card issued to Brandon Anderson just two (2) days before Mr. Antoine got married on March 5, 2010.

In response to Antoine's contention that based on Special Agent Raden's testimony that he had to review the videos repeatedly to understand that there were only two men using the credit cards in the various store, the jury could not have determined that it was Antoine in the videos, we disagree. Unlike Special Agent Radens, the jury had the benefit of watching the videos and viewing the still photos taken from the videos while sitting in the same courtroom as Mr. Antoine. They also had the benefit of having seen photographs of Gardiner and Foster and Serphin was in the courtroom throughout the trial.

Moreover, we disagree with Mr. Antoine's contention that a judgment of acquittal must be granted because even the government was confused as to who was involved in the events of March 3, 2010, as evidenced by Special Agent Radens telling the grand jury on November 30, 2010, that one of the four men involved was "Brentt K. Antoine" and showing them a photograph of Brentt K. Antoine, and the government issuing an arrest warrant for Brentt K. Antoine. While the jury could have concluded based on this evidence that the government had not proven beyond a reasonable doubt that it was Defendant Antoine that was present on March 3, 2010, they did not do so. The jury chose not to give significant weight to that evidence as was their right. For this same reason, we also disagree with Mr. Antoine that the arguments he raised in rebuttal to the Government's objection to his motion mandate that we grant his motion for judgment of acquittal. It was up to the jury to determine the weight to give Officer Burek's identification of Mr. Antoine in light of Special Agent Radens having shown the officer photographs of both Brentt K. Antoine and Mr. Antoine as well as the weight to be given to any evidence introduced that the address provided to Officer Burek on March 3, 2010 during the traffic stop was not Antoine's address, that the telephone number provided was not valid, and that the government had two dates of birth, the wrong Social Security number, and the wrong height. Id. at p. 127. Again, a Court may not "usurp the role of the jury by weighing credibility and assigning weight to the evidence, or by substituting its judgment for that of the jury." Brodie, 403 F.3d at 133.

Finally, with respect to Antoine's argument that the government did not conduct any fingerprinting or other type of hand exemplar to support any type of identification, it did not have to do so.

In conclusion, viewing the evidence of record in the light most favorable to the government, we find that there was substantial evidence from which any rational trier of fact could have found beyond a reasonable doubt that it was Defendant Antoine who was involved in the illegal activity that occurred in various Walmart and Giant Eagle stores on March 3, 2010 and therefore, could have found that he was guilty of all five (5) counts of the superseding indictment filed against him. Accordingly, Mr. Antoine's motion for judgment of acquittal must be denied.

**ORDER**

AND NOW, this __5th__ day of August, 2013, it is HEREBY ORDERED, ADJUDGED, AND DECREED that Defendant Brent Kevin Hercules Antoine's motion for judgment of acquittal shall be DENIED. An Order Setting Sentencing Hearing shall be issued FORTHWITH.

Maurice B. Cohill, Jr.
Senior District Court Judge